THE HONORABLE RICARDO S. MARTINEZ

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| DEMARIO ROBERTS, et al., | NO. 2:18-CV-00837-RSM-BAT |
| Plaintiffs, | DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | **NOTE ON MOTION CALENDAR:** |
| STEPHEN SINCLAIR, et al., | **August 2, 2019** |
| Defendants. | |

Defendants STEPHEN SINCLAIR, ERIC ASKREN, JAMIE DOLAN, HENRI FISCHER, PETE MAXSON, MIKE OBENLAND, JAMES PARKS, STEFAN ROSE, DAVID SHERMAN, BELINDA STEWART, and JEFF UTTECHT,[1] by and through their attorneys, respectfully move for an order granting summary judgment and dismissing Plaintiffs' claims with prejudice.

## I.    INTRODUCTION & RELIEF REQUESTED

Plaintiffs are five individuals who are currently or were previously in Washington Department of Corrections (DOC) custody. Plaintiffs allege Defendants violated their constitutional rights and RLUIPA by denying them the opportunity to participate in the Ramadan meal program and having a Ramadan meal program that requires individuals to sign

---

[1] Plaintiffs' amended complaint lists an "Unidentified Chaplain" as a Defendant. ECF No. 59, at 3 & 7. It is unclear who Plaintiffs are referencing. Because the arguments raised in this motion would apply equally to this unidentified person and this person has not been served, dismissal of all claims is still appropriate.

1

up months in advance of Ramadan. Defendants seek dismissal of Plaintiffs' claims. Contrary to the statements in Plaintiffs' complaint and ex parte motion for a temporary restraining order, the original four plaintiffs failed to exhaust their administrative remedies and John James did not exhaust until after Plaintiffs filed their amended complaint. As such, all of Plaintiffs' claims can be dismissed for failure to exhaust.[2]

On the merits, Plaintiffs' challenge to DOC's Ramadan policy fails as a matter of law. Requiring inmates to complete and submit a simple form to participate in a religious event does not impose any substantial burden on Plaintiffs' religious beliefs. To the extent that completing a form that takes less than five minutes imposes a substantial burden, the sign-up process serves compelling government interests. As such, Plaintiffs do not have viable RLUIPA claims. Furthermore, any claims for injunctive relief—to the extent such claims are viable—are now moot. Finally, because Defendants are entitled to qualified immunity on the constitutional claims and there is no monetary liability on RLUIPA claims, all claims for monetary damages must also be dismissed. Therefore, the Court should dismiss Plaintiffs' claims with prejudice

## II.    STATEMENT OF FACTS

### A.    DOC's Food Service Program

DOC's food service program is unlike any other. DOC has to account for the dietary needs of all 18,000 individuals in its custody. Declaration of Bryan King (King Dec.), at ¶ 1. This requires sourcing, preparing, and providing 50,000 meals each day. King Dec., at ¶ 1. DOC accomplishes this task within the unique confines of prison, where activities and movement of inmates are highly regulated to ensure the safety and security of DOC staff and

---

[2] When this case was first filed, the parties focused on Plaintiffs' allegations regarding their weight loss. As explained in Defendants' motion to dissolve and their response to Plaintiffs' motion to amend and motion to extend discovery, there are many reasons to be skeptical of Plaintiffs' claims of weight loss. For purposes of Defendants' summary judgment motion, however, these allegations are not material because they do not affect the legal analysis and there is no indication that any Defendant was aware of their claimed weight loss prior to the filing of this lawsuit. Defendants reserve the right to file an appropriate motion in the future regarding these claims of weight loss that appear to be unsupported.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

2

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

incarcerated individuals. *Id.* DOC offers five standard diets (mainline, a vegetarian mainline alternative, a milk mainline alternative, Kosher, and Halal) as well as a variety of medically prescribed therapeutic diets (Consistent Carbohydrate (Diabetic), Lower Protein, Low K+ (Renal), Mechanical Soft, No Gluten, No Peanut, No Tomato, Metabolic (lighter fare), Puree, and Liquid diets). King Declaration, at ¶ 2. To provide these diets and ensure consistency across facilities, DOC plans the diets centrally, and they are reviewed by the Dietary Services Manager to ensure they meet dietary guidelines. *Id.*; Declaration of Counsel (Counsel Dec.), Ex. 1, Brent Carney Deposition, at 19:18-25, 23:12-21. DOC's menu is intended to meet nutritional standards identified in DOC policy that are based on the Dietary Guidelines for Americans. Counsel Dec., Ex. 1, at 26:2-17, 31:1-12, 31:22-32:4; King Dec., at ¶ 2.

Although DOC facilities do not establish their own menus, they are responsible for ordering the food needed to serve the menus. King Dec., at ¶ 4. The Monroe Correctional Complex (MCC), where Plaintiffs were housed in 2018, serves approximately 2,400 inmates in the five separate prison facilities. Declaration of Linda Heise (Heise Dec.), at ¶ 1. Because of the volume of food that MCC provides (approximately 7,000 meals per day), the number of special diets that require accommodation, and the fact that DOC needs to meet the nutritional and dietary needs of those in its custody, strict adherence to policy is required. *Id.*

## B. DOC's Ramadan Meal Program

DOC has a longstanding practice of accommodating the religious beliefs and practices of its incarcerated population, including by providing meals to Muslim inmates who fast during Ramadan. ECF No. 16, Declaration of Belinda Stewart (Stewart Dec.), at ¶ 3 & Ex. 1. At various times over the years, DOC has sought the input of Muslim community members, including CAIR Washington, regarding the development of a halal diet and the Ramadan meal program. ECF No. 16, Stewart Dec., at ¶ 8; King Dec., at ¶ 3. In the tightly controlled prison environment, accommodating religious practices requires that incarcerated individuals follow established process and procedure so that DOC knows who wishes to participate in a particular

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

3

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1  religious event and can make necessary custody, food service, and other plans for the event.

2  ECF No. 16, Stewart Dec., at ¶¶ 5 & 7.

3       DOC's Ramadan meal program accommodates Muslim inmates who wish to fast for

4  Ramadan by providing meals for Muslim inmates to break their fast. Heise Dec., at ¶ 6; King

5  Dec., at ¶ 6. As with other meals, DOC centrally develops a Ramadan menu to ensure

6  consistency and DOC staff perform a nutritional analysis to ensure that the menu meets dietary

7  guidelines. Counsel Dec., Ex. 1, at 23:18-21. DOC's Ramadan menu meets the daily caloric

8  requirements for inmates of 2,600 to 2,900 calories. Counsel Dec., Ex. 1, at 31:22-32:6. The

9  caloric and nutritional content in the Ramadan menu is comparable to the nutritional and

10 caloric content of DOC's mainline menu. Counsel Dec., Ex. 1, at 62:24-64:3.

11      The Ramadan meals are Halal and consist of a fasting tray and a microwavable hot

12 meal. Heise Dec., at ¶ 6; King Dec., at ¶ 6. The fasting tray includes: two sandwiches (turkey

13 or bologna and peanut butter and jelly), a whole grain muffin, whole grain cookies, an oatmeal

14 packet, powdered milk, chips, a breakfast bar, dates, and condiments. Heise Dec., at ¶ 6; King

15 Dec., at ¶ 6. The tray also includes supplements of hard-boiled eggs, fresh fruit, and veggie

16 sticks. King Dec., at ¶ 6. The microwavable hot meal is manufactured "TV dinner" style and

17 contains a protein entrée, hot vegetable, and starch. *Id.* For example, the microwavable hot

18 meal may contain breaded fish, Halal chicken patty, Halal turkey casserole, or Halal beef with

19 gravy. Heise Dec., at ¶ 6. All meals come with a starch, fresh vegetables, and a fresh fruit. *Id.*

20 Although the microwavable hot meal is the same hot meal offered to inmates on the Halal diet,

21 production of the Halal meals is on a much greater scale leading up to Ramadan because there

22 typically are 500 or more inmates who participate in Ramadan, but only 100 or so who are on

23 the Halal diet at any given time. King Dec., at ¶ 6. Also, the fasting trays contain items that are

24 not served year round. *Id.*

25      DOC's Ramadan meal program is designed to ensure that all inmates receive the same

26 Ramadan meals. DOC has not traditionally provided alternative meals to inmates in place of

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

4

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

the Ramadan meals. Instead, when an inmate is on a medical/therapeutic diet, the medical diet supersedes any religious diet absent an inmate signing a form to refuse the medical diet. King Declaration, at ¶ 11. As such, DOC typically provides the medical diet over the religious diet. *Id.* DOC has also not created hybrid medical/religious diets. *Id.* Blending therapeutic and religious diets would raise significant health and logistical concerns. *Id.* Not only would it be difficult to logistically manage, it creates the risk that kitchen staff make an error in providing the inmate an meal suited to his individual medical needs. *Id.*

DOC puts significant planning into the Ramadan meal program in order to accomplish the task of providing nutritionally adequate Ramadan meals while also meeting the needs of the entirety of the DOC's population. ECF No. 16, Stewart Dec., at ¶ 7. To accommodate the provision of fasting trays, DOC's Correctional Industries sources and purchases the food from vendors and then assembles the meals in time to ensure that the meals are available for Ramadan. King Dec., at ¶ 7. This requires DOC to prepare and have ready more than 30,000 special meals for the month-long Ramadan observance. King Dec., at ¶ 7. Again, all of this work is in addition to the feeding of the remaining inmate population and other religious feasts, including Passover (which in recent years is close in time with Ramadan, requiring contemporaneous planning for the two observances). King Dec., at ¶ 7; Heise Dec., at ¶ 5.

To facilitate the planning necessary for DOC to accommodate the needs of Muslim inmates who wish to fast during Ramadan, there is an established sign-up process. The sign-up process is simple: complete a one page form that Plaintiffs estimate would take fewer than five minutes to complete and return it to the Chaplain. ECF No. 16, at ¶ 5; Counsel Dec., Ex. 2, Roberts Deposition, at 41:6-7; Counsel Dec., Ex. 5, Livingston Deposition, at 54:19-55:3; Counsel Dec., Ex. 4, Mohamed Deposition, at 27:5-15. This sign-up process occurs several months in advance of Ramadan to allow DOC to produce the meals in time for Ramadan. King Dec., at ¶ 8. This advance planning allows DOC facilities to order in advance and ensure that they receive the correct amount of food in time for Ramadan. Heise Dec., at ¶ 9. If there were

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

5

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

not advance planning and ordering of food, DOC would run the risk of not having adequate food in time for the event. *Id.* The 2018 Ramadan sign-up process began in January. On January 16, 2018, DOC notified the incarcerated population of the requirements for participation through a written memo. ECF No. 16, Stewart Dec., at ¶ 6 & Ex. 2. The memo was posted and made readily available to inmates. ECF No. 16 Stewart Dec., at ¶¶ 5-7; Declaration of David Sherman (Sherman Dec.), at ¶ 4. As it pertains to the Washington State Reformatory (WSR) at MCC, the memo was posted in hallways in the units where inmates pass every day and in the activity centers. Sherman Dec., at ¶ 4; Counsel Dec., Ex. 7, at 15:9-17:15. In addition, Chaplain Sherman sent a copy of the memo and a sign-up form to inmates that had been participating in Muslim religious programming. Sherman Dec., at ¶ 4; Counsel Dec., Ex. 7, at 15:9-16:3.

Once the sign-up period closed, religious programs staff compiled and distributed participant lists to each facility and the facility Chaplains would post the list so that individuals could confirm their presence on the list or request to be added if they believed they were inappropriately left off. ECF No. 16, Stewart Dec., at ¶ 6 & Ex. 2. As it pertains to MCC/WSR, Sherman periodically posted a list of inmates from whom he had received forms and approved prior to the expiration of the sign-up period and posted another list after the end of the sign-up period. Sherman Dec., at ¶ 6. Sherman also met with inmate Muslim leaders, including James, to go over the list of inmates who had been approved to participate in Ramadan in February 2018. Counsel Dec., Ex. 7, at 40:23-44:12. Of the Plaintiffs, only James' name was on the list of individuals who had signed up to participate in February. Sherman Dec., Ex. 2.

**C.    Plaintiffs' Individual Participation in the Ramadan Meal Program**

As discussed in more detail below, all five Plaintiffs were inmates in DOC's custody during both the sign-up period for Ramadan 2018 and Ramadan 2018. Other than John James, Plaintiffs did not submit the required paperwork to participate in the Ramadan meal program and did not raise the issue with any DOC staff until the eve of Ramadan.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

6

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

### 1.     Plaintiff Demario Roberts

Roberts has been in DOC custody since May 2017 and was housed at MCC from June 2017 until May 2019. Counsel Dec., Ex. 2, at 6:2-4, 8:4-6; Counsel Dec., Ex. 3. He has not requested a religious diet during his incarceration. Roberts indicates he has not requested a halal meal because he does not like DOC food and "just don't eat here." Counsel Dec., Ex. 2, at 20:21-21:5. DOC did not receive a Ramadan meal request form from Roberts in 2018. ECF No. 16, Stewart Dec. ¶ 12; Sherman Dec., at ¶ 6. Because DOC did not receive a form, Roberts was not on the list of approved inmates that was given to fellow John James in February 2018. Sherman Dec., Ex. 2. There is no evidence that Roberts communicated with Sherman about his desire to be on the list prior to the first day of Ramadan, May 16. ECF No. 20-1, at 11.[3]

On May 21, 2018, DOC received a grievance from Roberts that he was not receiving Ramadan meals. ECF No. 17, Declaration of Peter Maxson (Maxson Dec.), at ¶ 7 & Ex. 2. Maxson interviewed Roberts that day and asked Roberts whether he signed up for the Ramadan meal program. *Id.* Roberts responded he had not. ECF No. 17, Maxson Dec. at ¶ 7. Maxson also asked Roberts whether he had seen the sign-up information posted in January. *Id.* Roberts said he had, but that he did not submit the required form. *Id.* Maxson asked Roberts if he agreed to informally resolve the grievance on that basis, and the grievance was marked informally resolved at Level 0. *Id.* Roberts did not appeal or pursue the grievance further. *Id.*

### 2.     Plaintiff Mohamed Mohamed

Mohamed entered DOC custody in 2015. Counsel Dec., Ex. 4, Mohamed Deposition, at 9:13-14. He was housed at the Coyote Ridge Corrections Center in 2016 and 2017, where he signed up for and participated in the Ramadan meal program. Stewart Dec., at ¶ 13; Counsel Dec., Ex. 4, at 22:19-25. Mohamed transferred to MCC in December 2017 and had an anticipated earned early release date in May. Stewart Dec., at ¶ 13; Counsel Dec., Ex. 4, at 16:16-18. However, in April 2018, while housed in the minimum security unit, Mohamed

---

[3] The page numbers referenced are contained on the bottom left of the page.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

7

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

received a serious infraction for violating WAC 137-25-030(603) – Introducing or transferring any unauthorized drug or drug paraphernalia – based on evidence that Mohamed had conspired to introduce marijuana and spice into the prison. Stewart Dec., at ¶ 13. A hearings officer found Mohamed guilty of the infraction and sanctioned him to a loss of 30 days of good conduct time. Stewart Dec., at ¶ 13. This extended his early release date past Ramadan, to June 20, 2018, and he was demoted to the medium custody unit at MCC. Stewart Dec., at ¶ 13.

There is no evidence that Mohamed gave a Ramadan meal sign-up form to a Chaplain at MCC. Records show that on May 2, 2018, after Mohamed's release date was extended, he sent an electronic kiosk message to the Chaplain and asked "Can I get put on Ramadan List? I missed the deadline..." ECF No. 20-1, at 16. The Chaplain responded that it was too late to sign up. ECF No. 20-1, at 17. Mohamed responded by saying "I didnt (sic) have a choice because I lost good time, 30 days. I have to get on that list. Religious purposes cause I will not go too mainline. Thank you." ECF No. 20-1, at 18.

Mohamed filed a grievance on May 16, 2018. ECF No. 17-1, at 41. Maxson investigated the grievance, determined DOC had no record of Mohamed submitting the Ramadan form, and concluded that Mohamed could not be given the requested relief as a result. ECF No. 17-1, Maxson Dec., at ¶ 8 & Ex. 3. Mohamed did not appeal the grievance response. *Id.* Mohamed purchased a significant amount of food from the commissary, and items Mohamed received on May 17, 2018, included ten packages of white rice, ten packages of cheesy rice and beans, cheese, summer sausages, cookies, Doritos, potato chips, a hot pickle, and swiss rolls. ECF No. 21, Declaration of Matthew Blair (Blair Dec.), Ex. 7.

### 3.   Plaintiff Jeremy Livingston

Livingston reentered DOC custody at the Washington Corrections Center (WCC) on January 18, 2018. Counsel Dec., Ex. 5, Livingston Deposition, at 11:11-13; ECF No. 16, Stewart Dec., at ¶ 14. He requested a Halal diet in February 2018. ECF No. 16, Stewart Dec., at ¶ 14. Livingston had previously been incarcerated with DOC from October 2015 to June

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

8

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

2017 and was familiar with the Ramadan sign-up process through this prior incarceration. Counsel Dec., Ex. 5, at 11:17-12:15, 51:16-18. Livingston did not sign up for Ramadan during the Ramadan sign-up period. Counsel Dec., Ex. 5, at 51:19-52:20.

On May 15, 2018, Livingston sent a kiosk message to the Chaplain asking to be placed on call out for Ramadan night studies and stating he had not been placed on the Ramadan List. ECF No. 20-1, at 6. Livingston sent another message on May 17, 2018, asking to be put on the Ramadan List. *Id.* The Chaplain responded and indicated he had no record of Livingston signing up for Ramadan and that he (the Chaplain) had emailed the WCC Chaplain to see if there was a record of Livingston signing up while at WCC. *Id.* The Chaplain asked if Livingston had a record showing he had signed up, and Livingston responded "I left WCC before I could sign up plus it was too far before Ramadan even started. Is there anyway you can accomodadate (sic) me for Ramadan?" *Id.* In follow up, the Chaplain confirmed that notice of the Ramadan sign-up process was posted in all living units at WCC, and that there was no record of correspondence from Livingston to the WCC Chaplain requesting participation in the Ramadan meal program. ECF No. 20-1, Ex. 1, at 8; Sherman Dec., at ¶ 6.

On May 16, 2018, Livingston submitted an emergency grievance stating he requested a Ramadan meal in a kiosk message and had not received the meal. In the grievance, Livingston stated he was on a Halal diet and that he "had received it but not my meal for when I break my fast after sundown." ECF No. 17, Maxson Dec., at ¶ 9. Maxson interviewed Livingston about his grievance on May 22, 2018, asking why he did not sign up at WCC. *Id.* Livingston said he was in segregation and never saw a posting. *Id.* Upon further questioning, Livingston indicated he knew about the sign up process from being in prison before. *Id.* Maxson explained there was no record of Livingston signing up for Ramadan as was required and asked Livingston whether he agreed his grievance was resolved on this basis. *Id.* Livingston stated that he "guessed that it was resolved" but believed DOC still had to feed him. *Id.* The grievance was marked informally resolved and Livingston did not appeal this decision. ECF No. 17, Maxson Dec, at ¶

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

9

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

9 & Ex. 4; Counsel Dec., Ex. 5, at 77:22-23. Commissary records show that he purchased and received numerous food items from the inmate store in May and early June, including summer sausage, corn tortillas, and over a case of Ramen. ECF No. 21, Blair Dec., Exs. 4 & 8.

### 4. Plaintiff Naim Lao

Lao entered DOC custody in June 2017 and arrived at MCC in September 2017. ECF No. 16, Stewart Dec., at ¶ 15; Counsel Dec., Ex. 6, Lao Deposition, at 13:14-24. Chaplain Sherman sent Lao a copy of a Ramadan meal sign-up form in January 2018. Sherman Dec., at ¶ 4 & Ex. 1. Lao did not sign up for the Ramadan meal program. Counsel Dec., Ex. 6, at 54:17-23. On May 17, 2018, Lao sent a kiosk message to the Chaplain to ask to get on the Ramadan List to receive meals. ECF No. 20-1, at 14. The Chaplain responded that he could add Lao to the daily prayer but not the fast list because Lao needed to sign up by January 30, 2018. *Id.* Lao sent a kiosk message to the Chaplain a few days later complaining he was not on the daily prayer list and the chaplain responded that Lao had been placed on the callout list for prayer. *Id.* On May 23, 2018, Lao received an exception and was added to the Ramadan Meal List and began receiving meals. Stewart Dec. ¶ 15; Counsel Dec., Ex. 6, at 57:1-4.

### 5. Plaintiff John James

James has been incarcerated since the early 1990s. Counsel Dec., Ex. 7, at 38:24-25. James transferred to MCC on January 2, 2018. Counsel Dec., Ex. 7, at 8:4-18. Shortly thereafter, James became one of the inmate leaders for Jummah. Counsel Dec., Ex. 7, at 26:18-22. James has been on a gluten free to treat a medical condition. Counsel Dec., Ex. 7, at 81:16-20, 84:7-9. James submitted a Ramadan meal request form and was added to the Ramadan meal program in January 2018. Counsel Dec., Ex. 7, at 8:22-24. James was on the Ramadan list and received the Ramadan meals. Counsel Dec., Ex. 7, at 89:24-90:1. Some of the Ramadan meals contain gluten. Counsel Dec., Ex. 7, at 55:17-56:25. James traded the items in the Ramadan meals to other inmates in exchange for items that he could eat. Counsel Dec., Ex. 7, at 56:23-57:6. James also supplemented his Ramadan meals with food from the commissary

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

10

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1   and the quarterly package program. Counsel Dec., Ex. 7, at 76:25-80:17. On the first day of

2   Ramadan, James spoke to an unidentified cook about getting a different meal, and this cook

3   told him that the Ramadan meal was all that he or she had for James. Counsel Dec., Ex. 7, at

4   55:17-56:7. The cook was the only DOC staff person to whom James clearly recalled speaking

5   during Ramadan 2018. Counsel Dec., Ex. 7, at 57:18-58:19. On June 12, 2018, a couple days

6   after this action was filed, DOC received a grievance from James regarding this issue. Second

7   Dec. of Peter Maxson, at ¶ 7. As discussed in more detail below, James finished exhausting his

8   administrative remedies after the amended complaint was filed. *Id.*

9   **6.      Events After Ramadan 2018 Involving Plaintiffs**

10   Since Ramadan 2018, three Plaintiffs released from DOC custody. Mohamed released

11   in August 2018. Counsel Dec., Ex. 4, at 7:8-9. Lao transferred to Bishop Lewis work release

12   and released from there on June 10, 2019. Counsel Dec., Ex. 6, at 14:4-10. Livingston released

13   from DOC in February 2019. Counsel Dec., Ex. 5, at 11:14-16. Roberts is still incarcerated, but

14   he successfully signed up to participate in the Ramadan meal program in 2019. Counsel Dec.,

15   Ex. 3, at 2 of 8 (showing Roberts was on Ramadan meal program). James was given a special

16   accommodation of gluten free meals during Ramadan 2019. Heise Dec., at ¶ 10; King Dec., at

17   ¶ 12. James expressed satisfaction with the arrangement. Heise Dec., at ¶ 10; Counsel Dec.,

18   Ex. 7, at 62:9-12 (indicating that he received gluten free "[a]s best as they could").

19   **III.     ARGUMENT**

20   A moving party is entitled to summary judgment if the evidence produced by the

21   parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251

22   (1986). To determine if summary judgment is appropriate, the court must consider whether a

23   particular fact is material and whether there is a genuine dispute as to that material fact left to

24   be resolved. Fed. R. Civ. P. 56(c). If the nonmoving party bears the burden of proof at trial, the

25   moving party is not required to bring forth any additional evidence in support of the motion as

26   long as the motion demonstrates the absence of genuine disputes of material facts and that the

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

11

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). Where there is a complete failure of proof concerning an essential element of the non-moving party's case, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

## A.   Plaintiffs Failed to Exhaust Their Claims

Incarcerated individuals are required to properly exhaust their administrative remedies before bringing lawsuits about prison conditions. 42 U.S.C. § 1997e(a). Inmates must not only fully exhaust available administrative remedies, but they also must exhaust those remedies in a timely manner and abide by the administrative rules governing the internal grievance process. *Woodford v. Ngo*, 548 U.S. 81, 83 (2006). To effectively exhaust his administrative remedies, an inmate must use all the formal steps of the prison grievance process. *Griffin v. Arpaio*, 557 F.3d 1117, 1119 (9th Cir. 2009). Exhaustion must be accomplished prior to the filing of the lawsuit. *McKinney v. Carey*, 311 F.3d 1198, 1199 (9th Cir. 2002) (requiring dismissal when exhaustion was ongoing). *But see Cano v. Taylor*, 739 F.3d 1214, 1220 (9th Cir. 2014) (indicating that exhaustion is proper when a claim is exhausted between the filing of the original complaint and the filing of the amended complaint). RLUIPA incorporates the PLRA's exhaustion requirements. *Fuqua v. Ryan*, 890 F.3d 838, 844 (9th Cir. 2018).

When prison officials move for summary judgment based on exhaustion, they bear the initial burden of showing that there was an available administrative remedy and that the plaintiff did not exhaust that administrative remedy. *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014). If prison officials make such a showing, a prisoner can overcome the exhaustion defense by producing evidence showing that the administrative remedies were effectively unavailable to him. *Id.* If the evidence shows that the remedies were available and the inmate failed to properly exhaust such remedies, the inmate's claims must be dismissed.

Here, four of the Plaintiffs (Roberts, Mohamed, Lao, and Livingston) failed to pursue their grievances through all of the stages of the grievance program. Mohamed and Lao did not

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

12

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

appeal the Level I grievance response, and Roberts and Livingston failed to appeal the Level 0 response. ECF No. 17, at ¶¶ 10; Second Maxson Dec., at ¶¶ 3-6. As such, these four failed to exhaust on that basis and their claims must be dismissed. James filed his grievance after the lawsuit was originally filed. He pursued his grievance through Level III, but he did not receive a Level III response until after the filing of the amended complaint. Second Maxson Dec., at ¶ 7. As such, James also failed to fully exhaust his administrative remedies related to Ramadan 2018 prior to filing suit. Therefore, because all five Plaintiffs failed to exhaust their administrative remedies, their claims must be dismissed.

## B. Plaintiffs' RLUIPA Claims Are Moot

Plaintiffs' RLUIPA claims seek only injunctive and declaratory relief.[4] Three of the five plaintiffs (Mohamed, Livingston, and Lao) no longer are in prison. Their RLUIPA claims are therefore moot. "An inmate's release from prison while his claims are pending generally will moot any claims for injunctive relief relating to the prison's policies unless the suit has been certified as a class action." *Alvarez v. Hill*, 667 F.3d 1061, 1064 (9th Cir. 2012) (quoting from *Dilley v. Gunn*, 64 F.3d 1365, 1368 (9th Cir. 1995)). "The same is true for claims seeking declaratory relief." *Id.* (citing *Rhodes v. Stewart*, 488 U.S. 1, 2-4 (1988)).

There are two, narrow exceptions to mootness, neither of which applies here. The first exception applies when the claims are capable of repetition, yet will continue to evade review. This exception "is limited to extraordinary cases in which (1) the duration of the challenged action is too short to be fully litigated before it ceases, and (2) there is a reasonable expectation that the plaintiff will be subjected to the same action again." *Id.* (quoting from *C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 983 (9th Cir. 2011). Notably, a plaintiff who releases from prison has no reasonable expectation of returning to prison for purposes of

---

[4] Plaintiffs' RLUIPA claims appear to be appropriately limited to such relief because RLUIPA does not provide for monetary damages against a state, an official acting in his or her official capacity, or an official acting in his individual capacity. *See Sossamon v. Texas*, 563 U.S. 277 (2011); *Holley v. Cal. Dep't of Corr.*, 599 F.3d 1108, 1112 (9th Cir. 2010); *Wood v. Yordy*, 753 F.3d 899, 903-04 (9th Cir. 2014).

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

13

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

this exception. *Id.* (citations omitted); *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) (case-or-controversy requirement is not satisfied by the possibility that a party will be prosecuted for violating criminal laws).

The second mootness exception is a variation of the first; it applies where, although there is no reasonable likelihood the plaintiff himself will be subject to the same alleged harm in the future, he is challenging ongoing policies to which others will be subject. *Id.* at 1065 (citations omitted). Importantly, courts have limited their application of this exception to "short-lived pretrial proceedings in criminal prosecutions, where civil class actions would not be conducive to obtaining the relief sought." *Id.* Moreover, as held in *Alvarez*, even if the exception applies more broadly, it would not apply to claims (including RLUIPA claims) challenging prison policies affecting conditions of confinement. *Id.* ("While we have assumed, for purposes of this appeal, that at least some of the policies and practices Alvarez challenged remain ongoing and, thus, will continue to affect current ODOC inmates, those inmates can bring their own RLUIPA claims...."). Accordingly, Mohamed, Livingston, and Lao no longer have cognizable RLUIPA claims.

Although Roberts and James remain incarcerated, and will be so for Ramadan 2020, neither has a viable claim for prospective relief under RLUIPA. Roberts signed up for and participated in the 2019 Ramadan meal program. Counsel Dec., Ex. 3. As such, he certainly is aware of and cannot claim likely to be burdened by the sign-up process going forward, thereby negating any claim for injunctive relief. *See Saddiq v. Ryan*, 703 Fed. Appx. 570, 571 (9th Cir. 2017) ("Furthermore Saddiq now has notice of the prison's thirty-day notice policy and will not be substantially burdened by future unforeseen implementations of this prison policy."). As to James, DOC accommodated his request for a gluten-free Ramadan meal in 2019 and will continue to do so in the future. Heise Dec., at ¶ 10; King Dec., at ¶ 12. Therefore, all of Plaintiff's claims under RLUIPA should be dismissed as moot.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

14

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

C.    **Mootness Aside, Plaintiffs Do Not Have Viable RLUIPA Claims**

Even if Plaintiffs' RLUIPA claims were not moot, the claims fail on the merits as a matter of law. RLUIPA prohibits state correctional facilities from substantially burdening inmates' religious exercise unless the burden furthers a compelling government interest and does so by the least restrictive means. 42 U.S.C. § 2000cc-1(1)-(2). Under RLUIPA, the inmate bears the initial burden to show a prima facie case that the government regulation imposes a substantial burden on the exercise of his religious beliefs. *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005). Plaintiffs cannot meet that burden here because the Ramadan meal signup process they challenge is not a substantial burden on their religious exercise. Moreover, even if it were a substantial burden, the signup process serves a compelling government interest – allowing DOC to plan for, procure, and prepare sufficient meals to meet the demand for the Ramadan observance – and is the least restrictive means to achieve that interest.

1.    **The Sign-up Process Does Not Impose a Substantial Burden**

"[A] burden is substantial under RLUIPA when the state denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Shakur v. Schriro*, 514 F.3d 878, 888 (9th Cir. 2008) (internal quotes omitted). Requiring an inmate to sign a piece of paper or submit a form requesting to participate in a religious activity does not impose a substantial burden on the inmate's religious practices. *See Resnick v. Adams*, 348 F.3d 763, 768 n.6 (9th Cir. 2003). "[R]egistration places, at most, a slight burden on an inmate's right to religious freedom while serving as an important and beneficial 'bright line' that enables prison officials to ascertain the seriousness of the inmate's religious commitment and respond accordingly." *Jackson-Bey v. Hansimaier*, 115 F.3d 1091, 1097 (2d Cir. 1997).

Indeed, absent some requirement that inmates notify prison officials of their desire to participate in religious festivities, it would be impossible for prison staff to accommodate such requests. Therefore, DOC's requirement that Plaintiffs sign up to receive Ramadan meals does

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

15

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

not impose a substantial burden on Plaintiffs' religious practices. Courts have recognized the legitimacy of a prison system's interest in the orderly administration of its diet programs. *See Resnick*, 348 F.3d at 769. Courts also have upheld similar sign-up requirements from challenges in the past. *See Williams v. Fluiatt*, No. CV-12-5017-JTR, 2013 WL 6795947 (E.D. Wash. Dec. 23, 2013); *McDaniels v. Sherman*, No. 09-1296-JCC, 2011 WL 197441 (W.D. Wash. Jan. 21, 2011).

Each year, approximately 500 individuals sign up for and participate in the Ramadan meal program. King Dec. at ¶ 6. The signup process is not burdensome. In fact, Plaintiffs concede that filling out the single page form takes only a few minutes. Counsel Dec., Ex. 2, at 41:6-7; Counsel Dec., Ex. 5, at 54:24-55:3; Counsel Dec., Ex. 4, at 27:5-15. Additionally, because it is easy to determine the approximate time of Ramadan, Muslim inmates in DOC custody can anticipate the timing that the sign-up process will occur. Counsel Dec., Ex. 7, at 70:11-70:25. Moreover, the two Plaintiffs who remain incarcerated were able to fill out the form and thereby observe their faith during Ramadan 2019 with DOC-provided fasting meals. DOC's requirement that Muslim inmates who wish to participate in the Ramadan meal program fill out and submit a short form to the facility chaplain several months before Ramadan represents, at most, a negligible burden – hardly one that puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Shakur*, 514 F.3d at 888. Plaintiffs' RLUIPA claims thus fail as a matter of law.

### 2.     The Sign-up Process Serves a Compelling Interest

Even if the signup process were a substantial burden, it serves a compelling interest in that it enables DOC Food Service to plan for, source, prepare, and deliver the 30,000 Ramadan meals necessary for DOC to feed the Muslim inmates who observe Ramadan and sign up to participate in the Ramadan meal program while allowing it to also meet the needs of its own incarcerated inmates. *See* King Dec. at ¶ 7. Providing meals for the 500 or more individuals who participate in the Ramadan meal program each year is a significant undertaking. The

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

16

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

17,500 inmates who do not participate in Ramadan have to be fed, and so the Ramadan meals are produced in addition to normal food production. As with all other diets, DOC is obligated to ensure the Ramadan meals are nutritious and meet dietary guidelines. King Dec. at ¶ 7. The Halal certified food items included in the Ramadan meals come from limited vendors nationwide. Those vendors require notice and lead time to produce and ship the food product to the food factory at Airway Heights Corrections Center (AHCC). King Dec. at ¶ 8. The AHCC food factory requires time to plan and implement a production schedule to prepare and assemble the meals, and then deliver them to the other DOC facilities. *Id.* The other facilities require time to order food to meet their need, and to receive and prepare the meals for delivery to participating inmates. Heise Dec. at ¶ 7. This includes procuring and adding fresh fruit and vegetables to the meals received from the AHCC food factory. *Id.*

Without a signup process that requires Muslim inmates to confirm in advance their desire to participate in the Ramadan meal program, DOC would not be able to meet its legal obligation to accommodate those inmates with nutritious, Halal meals to break their fast for the duration of the month-long Ramadan observance. The signup process therefore furthers the DOC's compelling interest in planning for and accommodating the religious exercise of individuals in its custody. *See Walker v. Beard*, 789 F.3d 1125, 1136 (9th Cir. 2015) (compliance with the Constitution can be a compelling state interest). And it does so in the least restrictive manner by requiring only that Muslim inmates fill out a short form that takes only a few minutes to complete, and to return the form to the facility Chaplain. The fact that 500 or more inmates fill out and return the form and participate in the Ramadan meal program each year (including several of the Plaintiffs) undermines any claim that the process is restrictive or burdens Plaintiffs' or others' religious exercise.

**D.    Plaintiffs Have Failed to Show a Viable Eighth Amendment Claim**

It is only "'the unnecessary and wanton infliction of pain' . . . [which] constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312,

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

17

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1    319 (1986) (citing *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)). The Eighth Amendment

2    standard requires proof of both an objective and a subjective component. *Hudson v. McMillian*,

3    503 U.S. 1 (1992). The objective component of an Eighth Amendment claim requires that the

4    deprivation must be "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The

5    subjective component relates to the defendant's state of mind, and requires deliberate indifference.

6    *Farmer*, 511 U.S. at 834. In this case, Plaintiffs' claims fail to meet both prongs.

7            To be objectively, sufficiently serious, an individual must have been deprived of the

8    minimal civilized measure of life's necessities. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

9    Although inmates have a right to adequate food, the food does not need to be tasty or

10   aesthetically pleasing. *See LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993); *Williams v.*

11   *Berge*, 102 Fed. App'x 506, 507 (7th Cir. 2004) (inmate being served stale raisins and moldy

12   peanut butter with other food was not an Eighth Amendment violation). Additionally, as long

13   as an inmate is being provided adequate food, it does not matter the manner in which prisons

14   deliver that food. *See LeMaire*, 12 F.3d at 1456; *Green v. Ferrell*, 801 F.2d 765, 770-71 (5th

15   Cir. 1986) (two meals per day was adequate); *Griffis v. Gundy*, 47 Fed. App'x 327, 328 (6th

16   Cir. 2002) (diet of food loaf did not violate Eighth Amendment when loaf met nutritional and

17   caloric requirements). Repeated and unjustified failures to provide inmates with adequate

18   sustenance could rise to the level of an Eighth Amendment violation. *See Mendiola-Martinez*

19   *v. Arpaio*, 836 F.3d 1239, 1259 (9th Cir. 2016); *Foster v. Runnels*, 554 F.3d 807, 814 (9th Cir.

20   2009). However, the Eighth Amendment is not violated when prison officials place reasonable

21   conditions on receiving meals. *Freeman v. Berge*, 441 F.3d 543, 545 (7th Cir. 2006).

22           The four Plaintiffs who were not on the Ramadan menu were not denied food adequate

23   to meet their nutritional needs because each had the option to get mainline food. To the extent

24   they argue the mainline meals did not meet their needs because of their sincerely held religious

25   beliefs, that claim is more properly analyzed under RLUIPA or the First Amendment, not the

26   Eighth Amendment. To the extent any of these four plaintiffs now try to raise an eleventh hour

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

18

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1  claim that they were denied access to the mainline food, such claims would not be exhausted

2  because none of the plaintiffs filed grievances related to being denied the mainline food during

3  Ramadan. Additionally, each of the four had the opportunity to get Ramadan meals in 2018; all

4  they had to do was complete a simple form by the deadline. Therefore, regardless of the merit

5  of such claims under RLUIPA or the First Amendment, these four Plaintiffs' allegations do not

6  raise an Eighth Amendment claim because they have failed to show a sufficiently serious

7  deprivation. *See McEachin v. McGuinnis*, 357 F.3d 197, 204 (2d Cir. 2004); *LeFevers v. Saffle*,

8  936 F.2d 1117, 1120 (10th Cir. 1991) (denial of religious diet does not state a cognizable

9  Eighth Amendment claim).

10       James' Eighth Amendment claims fail for similar reasons. James concedes he was

11  given a Ramadan meal every day. Counsel Dec., Ex. 7, at 89:24-90:1. As such, James will not

12  be able to present sufficient evidence to show that he was deprived of a nutritionally adequate

13  diet during Ramadan because he was given the Ramadan meals that he requested and had the

14  option to have his gluten free diet by not signing up to participate in the Ramadan meal

15  program. "Providing meals that only accommodate either a prison's allergies or his religious

16  beliefs but not both is not a deprivation of 'the minimal civilized measure of life's

17  necessities.'" *Payne v. Doe*, 636 Fed. App'x 120, 123 (3d Cir. 2016) (citations omitted). Thus,

18  James does not present an objectively serious risk of harm under the Eighth Amendment.

19       Even if Plaintiffs were able to establish that their claimed deprivations met the

20  objective prong, Plaintiffs cannot establish that any of Defendants were deliberately indifferent

21  to their need for basic sustenance. Two of the defendants (Jeff Uttecht and Chaplain Askren)

22  were located at a different prison facility in 2018 and there is no evidence that they were aware

23  of Plaintiff's situation during Ramadan 2018 prior to this lawsuit being filed. Similarly, there is

24  no evidence that Jamie Dolan, Steven Sinclair, or Superintendent Obenland were aware of

25  Plaintiffs' situations before this lawsuit. Although there is evidence that Fischer, Maxson,

26  Parks, Rose, and Stewart were aware after the start of Ramadan that at least some of the four

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

19

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1    Plaintiffs were not on the Ramadan meal list, there is no evidence that these Defendants were

2    aware of a serious risk to these inmates' health or that they acted unreasonably based on the

3    information they had. Thus, there is insufficient evidence that any of the Defendants were

4    deliberately indifferent to any of Plaintiffs' health.

5    **E.      Plaintiff Have Failed to Show a Viable Free Exercise Claim**

6              For a prisoner to satisfy a First Amendment religious claim, he "must show the

7    [defendant] burdened the practice of [his] religion, by preventing him from engaging in

8    conduct mandated by his faith, without any justification reasonably related to legitimate

9    penological interests." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997) (citing *Turner v.*

10   *Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254 (1987). The *Turner* court provided four factors to

11   guide reviewing courts in determining the reasonableness of the regulation. "First, there must

12   be a 'valid, rational connection' between the prison regulation and the legitimate governmental

13   interest put forward to justify it." *Id.* (citations omitted). A second factor is "whether there are

14   alternative means of exercising the rights that remain open to prison inmates." *Id.* at 90. The

15   third consideration is the "impact accommodation of the asserted constitutional right will have

16   on guards and other inmates, and the allocation of prison resources generally." *Id.* Last, the

17   "absence of ready alternatives is evidence of the reasonableness of the regulation." *Id.*

18            Because RLUIPA provides greater protection than the First Amendment, a policy that

19   survives RLUIPA analysis also survives a First Amendment challenge. *Florer v. Bales-*

20   *Johnson*, 752 F. Supp. 2d 1185, 1202 (W.D. Wash. 2010). Because Defendants' actions did not

21   violate RLUIPA for the reasons discussed above, they also did not violate the First

22   Amendment. Even if the Court were to find a triable RLUIPA claim, dismissal of the First

23   Amendment claims would be appropriate. Plaintiffs' First Amendment claims fail because the

24   sign-up process does not impose a burden or prevent an inmate from exercising their faith.

25            Even assuming, for the sake of argument, that the Ramadan signup process does

26   impose a burden, the process would still be constitutional because it is reasonably related to

1   legitimate penological interests. DOC's sign-up process is ultimately designed to ensure that

2   DOC has accurate numbers of Ramadan participants to allow it effectively plan to provide the

3   Ramadan meal program. *Cf. Walker v. Beard*, 789 F.3d 1125, 1138 (9th Cir. 2015)

4   (recognizing avoiding potential legal liability as a legitimate penological interest). As

5   discussed above, the sign-up process is simple and the burden on an inmate's exercise of their

6   religion is minimal, if any. There is a logical and rational connection between this sign-up

7   process and the goal of ensuring DOC can adequately provide enough food. Furthermore, if

8   inmates do not wish to participate in the Ramadan meal program, there are alternative ways for

9   inmates to practice their faith, including by fasting and breaking the fast with food purchased

10  through the commissary, participating in the Ramadan prayer, or participating in other Islamic

11  activities. The absence of a sign-up process will harm other inmates because it will create the

12  potential that DOC be unable to plan adequately for Ramadan and run short of Ramadan meals.

13  It will also create confusion and an increased burden on prison guards and kitchen staff who

14  help administrate the Ramadan meal program. There is no evidence that DOC's sign up

15  process is an exaggerated response to these concerns. Finally, with respect to James' claims,

16  prison officials do not violate the First Amendment by providing regular Ramadan meals to an

17  inmate on a therapeutic diet. *Payne v. Doe*, 636 Fed App'x 120, 124 (3d Cir. 2016). Therefore,

18  Plaintiffs do not have viable First Amendment claims and such claims should be dismissed.

19  **F.    Plaintiffs Have Failed to Show a Viable Equal Protection Claim**

20      The Equal Protection Clause "is essentially a direction that all persons similarly

21  situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S.

22  432, 439 (1985). An Equal Protection claim requires an individual to "show intentional or

23  purposeful discrimination." *See Washington v. Davis*, 426 U.S. 229, 239 (1976); *Draper v. Rhay*,

24  315 F.2d 193, 198 (9th Cir. 1963). The Equal Protection Clause, however, does not require

25  absolute equality among inmates. *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003). To

26  survive summary judgment, an inmate must show he was not afforded a reasonable opportunity

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

21

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

to pursue his faith compared to prisoners of other faiths and that such conduct was intentional. *Freeman v. Arpaio*, 125 F.3d 732 (9th Cir. 1997), *overruled in part by Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008). If an inmate establishes that prison officials intentionally discriminated based on an inmate's religion, prison officials must bring forth some justification about the reason for the distinction. The Ninth Circuit has applied the *Turner* test to inmates' equal protection claims based on alleged religious discrimination. *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008).[5]

There is no evidence to support the claim that Muslim inmates were treated differently than other similarly situated inmates. All DOC inmates were required to follow the same sign-up process to participate in Ramadan, and there is no evidence that the sign-up process for Ramadan is more onerous than the sign-up process for Passover or other religious events. *See* Counsel Dec., Ex. 8, at 201:24-202:8. Assuming that inmates signed up through the process, Muslim inmates were given food that met the daily calorie requirements, just like other inmates in DOC custody. Therefore, Plaintiffs are not able to show that they were treated differently than similarly situated inmates based on their religion. Furthermore, to the extent that Plaintiffs can claim that there are differential treatment, such treatment serves legitimate penological goals for the reasons discussed in the prior section.

## G.   Plaintiffs' Money Damage Claims Fail Because Defendants Are Entitled to Qualified Immunity

In determining whether defendants are entitled to qualified immunity, the court makes a two-step inquiry. First, the court determines if plaintiff has shown that defendants violated his constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by*

---

[5] The level of scrutiny is not entirely clear in terms of equal protection claims related to alleged religious discrimination. Some district courts, at least in unpublished cases, in the Ninth Circuit have suggested that strict scrutiny applies to equal protection claims related to religious discrimination. *See, e.g.*, *Black v. Hansen*, Cause No. 11-2782-CMK-P, 2015 WL 1294965, at *7 (E.D. Cal. March 23, 2015). However, the Ninth Circuit has not said that explicitly and has applied *Turner* in cases like *Shakur*. The Court need not settle this question to resolve this case because even if the Court were to apply strict scrutiny, Plaintiffs have failed to show intentional discrimination and the Ramadan meal program's simple sign-up process would survive strict scrutiny.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT

22

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1    *Pearson v. Callahan*, 555 U.S. 223 (2009). Second, the court must determine if the right was

2    clearly established. *Id.* This requires the court to determine if it would have been clear to a

3    reasonable officer that his conduct was unlawful in the situation he confronted. *Id.* at 202. For

4    a right to be clearly established, "existing precedent must have placed the statutory or

5    constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012)

6    (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The plaintiff bears the burden of

7    proving that the right was clearly established. *See Davis v. Scherer*, 468 U.S. 183, 197 (1984).

8            Because Plaintiffs have failed to present viable claims of constitutional violations for

9    the reasons discussed above, Defendants are entitled to qualified immunity. Even if Plaintiffs

10   could raise viable constitutional claims, Defendants would still be entitled to qualified

11   immunity because the law is not clearly established. There is no clearly established case law

12   holding that prisons violate the First Amendment by requiring inmates to sign up in advance to

13   participate in Ramadan. In fact, the published Ninth Circuit cases suggest otherwise. *See*

14   *Resnick v. Adams*, 348 F.3d 763, 771 (9th Cir. 2003) (concluding application requirement to

15   receive religious diet did not violate First Amendment). And this Court has rejected similar

16   challenges to similar sign-up requirements. *See Williams v. Fluiatt*, No. CV-12-5017-JTR,

17   2013 WL 6795947 (E.D. Wash. Dec. 23, 2013); *McDaniels v. Sherman*, No. 09-1296-JCC,

18   2011 WL 197441 (W.D. Wash. Jan. 21, 2011). There is also no published case law that

19   suggests Defendants were required to create a therapeutic Ramadan diet for James or that they

20   violated the First Amendment by declining to offer a gluten free Ramadan meal in 2018. *See*

21   *Payne v. Doe*, 636 Fed App'x 120, 124 (3d Cir. 2016); *see also Leggett v. Solomon*, No. 14-

22   CT-3228-FL, 2017 WL 421915, at *4 (E.D.N.C. Jan. 31, 2017). With respect to Plaintiffs'

23   Eighth Amendment claims, courts have rejected similar claims and Plaintiffs will be unable to

24   point to a consensus of authority on this issue. Finally, although Plaintiffs' equal protection

25   claims are somewhat difficult to decipher, Plaintiffs will be unable to point to any case law that

26   clearly establishes that having a sign-up process violates the Equal Protection Clause. *See*

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT                    23                    ATTORNEY GENERAL OF WASHINGTON
                                                                      Corrections Division
                                                                      PO Box 40116
                                                                      Olympia, WA 98504-0116
                                                                      (360) 586-1445

1  *Garnica v. Wash. Dep't of Corr.*, 965 F. Supp. 2d 1250, 1275 (W.D. Wash. 2013) (rejecting

2  equal protection challenge to Ramadan meal program). Therefore, Defendants are entitled to

3  qualified immunity and Plaintiffs' claims for monetary damages must be dismissed.

4  **H.     Plaintiffs Do Not Have a Viable Claim for Injunctive Relief Under Section 1983**

5          In addition to meeting the traditional requirements for injunctive relief, a party seeking

6  a permanent injunction must actually succeed on the merits. *See e.g.*, *Valley View Health Care*

7  *Inc. v. Chapman*, 992 F. Supp. 2d 1016, 1042 (E.D. Cal. 2014). An inmate's release generally

8  moots any injunctive relief claim. *Dilley v. Gunn*, 64 F.3d 1365 (9th Cir. 1995).Three Plaintiffs

9  (Lao, Livingston, and Mohamed) have released from prison; their claims for injunctive relief

10  are therefore moot. As to Roberts and James, they are not entitled to injunctive relief because

11  they cannot show a viable Section 1983 claim on the merits, and their constitutional claims are

12  also moot for the reasons discussed in Section III.B. Therefore, Plaintiffs' claims for injunctive

13  relief must be dismissed.

## IV.     CONCLUSION

14

15          Defendants respectfully request that the Court grant their motion for summary

16  judgment and dismiss Plaintiffs' claims with prejudice.

17          RESPECTFULLY SUBMITTED this 9th day of July, 2019.

18                                          ROBERT W. FERGUSON
                                            Attorney General
19

20                                          s/ Timothy J. Feulner
                                            TIMOTHY J. FEULNER, WSBA #45396
21                                          Assistant Attorney General
                                            TimF1@atg.wa.gov
22

23

24

25

26

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 2:18-CV-00837-RSM-BAT                          24                ATTORNEY GENERAL OF WASHINGTON
                                                                    Corrections Division
                                                                    PO Box 40116
                                                                    Olympia, WA 98504-0116
                                                                    (360) 586-1445

1

<u>**CERTIFICATE OF SERVICE**</u>

2

I hereby certify that on the date below, I caused to be electronically filed the

3

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using

4

the CM/ECF system which will send notification of such filing to the following CM/ECF

5

participant:

6

GADEIR ABBAS                        gabbas@cair.com

7

JAY W. GAIRSON                      jay@gairson.com

8

CAROLYN M. HOMER               chomer@cair.com

9

LENA F. MASRI                       lmasri@cair.com

10

11

I declare under penalty of perjury under the laws of the United States of America that

the foregoing is true and correct.

12

EXECUTED this 9th day of July, 2019, at Olympia, Washington.

13

14

s/ Cherrie Melby

CHERRIE MELBY

15

Legal Assistant

Corrections Division

16

PO Box 40116

Olympia WA 98504-0116

17

360-586-1445

Cherrie.Melby@atg.wa.gov

18

19

20

21

22

23

24

25

26